No. 843

First Circuit

———

DELCOURT v. BERNARD

———

(October 7, 1931. Opinion and Decree.)
(December 8, 1931. Rehearing Refused.)
(February 1, 1932. Writ of Certiorari and
Review Refused by Supreme Court.)

———

J. M. Blache, Jr., of Hammond, and
S. S. Reid, of Amite, attorneys for plain-
tiff, appellee.

Milner & Porteous, of New Orleans, and
Ellis, Ellis & Ellis, of Amite, attorneys for
defendant, appellant.

MOUTON, J. Thomas street runs east
and west through the city of Hammond. It
is crossed by Cypress and Cherry streets
which run north and south. Cypress street
is west of Cherry street, there being a
distance of about 300 feet between the two
streets.

Thomas street is 38 feet wide. Six feet
on each side is reserved for the parking
of cars, leaving a traffic lane of 26 feet
for the use of the traveling public.

Plaintiff, with his daughter, Miss Camille, at the wheel, drove their car eastward on Thomas street through its intersection with Cypress street, and parked it on the south side of Thomas street facing east towards the crossing of Cherry street with Thomas street. It was parked near a building known as Noah's Ark. It was shown by Mr. Freiler, surveyor, that the distance from Ferrara's store eastward to the first crossing line is 113 feet. Noah's Ark, which is on the south side of Thomas street, Mr. Freiler says, is directly opposite Ferrara's store. Noah's Ark is therefore about 113 feet from the east line of Cherry street where it crosses Thomas street, and about 82 feet from its west line.

It is shown that after plaintiff had parked his car on the south side of Thomas street, near the Noah's Ark building, he passed in the rear of his auto, went next to the wheel where his daughter was sitting, and told her he was going across Thomas street to the Community store on the opposite side, and that he would come back in a little while. He says before he started to go across Thomas street he looked both ways, east and west along that street, and saw the red lights against traffic shining at the crossings of Cherry and Cypress streets, and that there were no cars in that block at that time. His daughter testifies that her father looked both ways before he started, and that the red traffic lights were shining at both ends of the block. It appears from the testimony of plaintiff, and of which there is no contradiction, that he was not in a hurry and proceeded to walk across towards the north side of Thomas street in his usual gait. When about two or three feet from the parked cars on that side of the street he was run into by a car driven by Mrs. Clifton C. Bernard, wife of defendant herein, against whom judgment was rendered for $1,700 by Judge Reed, then district judge. That judgment having been set aside because rendered in chambers without authorization, the case was tried by Judge Tycer, successor of Judge Reed, who gave judgment to plaintiff, increasing the amount to $3,400, and from which this appeal is taken.

Plaintiff had therefore about negotiated Thomas street, as above stated, when he was struck by defendant's car, and as was shown, by the right fender. Plaintiff says the block was clear of cars when he left the side of his car to go across.

Counsel for defendant offered a written statement of plaintiff dated July 25, 1929, wherein he says cars were then running in both directions in Thomas street. The accident occurred July 20, 1929. Five days after the collision this statement was dictated by plaintiff to Mr. Williams, adjuster for the Maryland Casualty Insurance Company, which had insured defendant's car.

Plaintiff testifies that when he dictated this statement he was in bed suffering from his injuries, and was then a very sick man.

A statement thus made to an employee of the insurance company is not the equivalent to testimony given under oath where the witness is subjected to examination and cross-examination. Courts should rather be guided by the testimony given in open court, and which should prevail over statements of that character, unless, for weighty reasons, the evidence given under the eye of the judge should be discarded.

Mr. Williams, the adjuster, was industriously engaged in taking statements from plaintiff and other witnesses in the case. It may be that he was actuated by the purest motives but we must say here that such systematic taking of testimony by adjusters or others similarly situated, unless transcribed with the view of making a settlement, should not be encouraged because of the indifference of witnesses, their probable inattention, or on account of the inaccuracies which may slip into such statements. These remarks are to apply to the statements of the other witnesses in respect to which, and to the testimony of plaintiff, we shall accept the evidence given in open court, as we do not find that the discrepancies between what appears in these statements and the testimony of the witnesses given in open court are of a character to affect their credibility and which does not seem to have been questioned by the trial judge.

Having disposed of the contentions of defendant's counsel in reference to these statements, we shall return to the discussion of the case, as to whether there were cars running on Thomas street when plaintiff started to go across.

One witness who was traveling eastward immediately before the collision said there was no car ahead of him; one said a car was going east before defendant's car struck plaintiff; and another that cars were going west. It does not appear that these cars entered the block before plaintiff left the side of his car to go across Thomas street, if it be true that about that time cars were traveling in that street, as was said by two witnesses, as against one who testified he was going east and there was no car ahead of him.

On this issue, which is somewhat doubtful, we have the testimony of plaintiff and his daughter, who say that before plaintiff started to go across Thomas street they looked both ways, and that the red signal was shining at both ends of the block. It is rational to infer that travelers, if there were any at these two intersections, had stopped their cars then; and that the block was clear, as was testified to by plaintiff.

The inference so drawn supports the statement of plaintiff that there were no cars on Thomas street when he started across.

The foregoing testimony and circumstances warrant the inference that plaintiff proceeded across the street on the assumption that the way was clear to the opposite side, as he had a right to rely on the protection these red lights gave him until superseded by the green lights, at which time travelers on Thomas street could cross over the intersection lines at both ends of the block.

The question is, was plaintiff justified in that assumption?

The proof is that the speed for autos, vehicles, etc., on Thomas street is fixed by ordinance of the city of Hammond at a rate no greater than ten miles an hour. The traffic lane of Thomas street, between the lines on each side for parking cars, is 26 feet. It is not disputed that a man walks about four or five feet per second. Hence, in about five seconds plaintiff would have walked across this traffic lane. It is figured that a car moving at 30 miles an hour will go about 210 feet in five seconds. It necessarily follows therefrom that a car going at ten miles an

hour, one-third of 30, would in five seconds go 70 feet. It is shown that the distance from the western line of the crossing at Cherry street to where plaintiff was struck is 82 feet.

If Mrs. Bernard had been going at ten miles an hour, as was required by the city ordinance, she would have been at a distance of 12 feet from plaintiff when he would have reached across the street, and the collision would not have occurred. Plaintiff had unquestionably the right to assume that autoists would respect the speed limit fixed by ordinance of the city, and was justified in attempting to negotiate Thomas street on that assumption, and was not therefore at fault.

Mrs. Bernard says when she first saw plaintiff he was standing still in the center or middle of Thomas street. Her version is that he suddenly ran or jumped ahead of her car, that she immediately stepped on her brakes but it was then too late to stop in time.

The proof is that the street lights were then burning brightly, and there is no doubt she could see the plaintiff at that time, about 9 p. m. Her evidence is, that when he sprang or ran ahead of her car, he was about ten feet ahead of her.

Mrs. Bernard was asked why, after she saw plaintiff, she did not turn to her left and thus avoid striking him. She said a car was coming the other way, and that it interfered with her turning to the left.

Wolf, witness for plaintiff and without interest in this suit, saw when plaintiff was struck. He was traveling east at the time and says no car was ahead of him; that he observed no car going east that was in the way of Mrs. Bernard to prevent her from making a left turn by which the accident could have been avoided.

Mrs. Turner testifies that she saw the collision and that Mrs. Bernard could have turned to her left without running into another car.

The testimony of Mrs. Bernard implies that she had seen plaintiff in time because her attempted excuse for the collision is that she did not avert it for the reason that a car coming from the opposite direction was in her way at the time.

In that respect she is flatly contradicted by Mr. Wolf and Mrs. Turner, disinterested witnesses.

The preponderance of the evidence on this vital point shows that she could have avoided the collision, and is sufficient to hold defendant liable. We shall, however, proceed to a discussion of the other contention of defendant before reaching our final conclusion.

The traffic lane in Thomas street is 26 feet. Mrs. Bernard repeatedly says that plaintiff was in the center of that street and ten feet ahead of her car when she first saw him. The proof shows that plaintiff was at about two feet from the parked cars when he was struck. Half of this traffic lane from the center of the street to the line used to park the cars is 13 feet, being half of the traffic lane. To give credence to Mrs. Bernard we would have to believe that plaintiff ran or jumped ahead of her car, which is hardly believable, also covered a distance of 11 feet while in her auto she covered only ten feet before striking him, although she was then moving at not less than 20 miles an hour. That is incredible.

Several witnesses testified that Mrs. Bernard was traveling at about the time of the collision at a lively gait. The estimate of her speed by these witnesses at that time ranged from 20 to 35 miles an hour. It is difficult to make an accurate estimate of the speed at which an auto is traveling. As a general proposition this is true. In this case, however, it is shown that Mrs. Bernard applied her brakes, and that the marks of the wheels of her auto were on the pavement for a distance of about seven feet, and that from the point of the collision the auto continued about 35 feet therefrom before it came to a stop. These physical facts, taken in connection with the estimate of her speed by the witnesses, warrant the inference that she must have been traveling, just prior to the application of her brakes, some 25 or 30 miles an hour.

The proof shows that Mrs. Bernard entered Thomas street at some point further east than the crossing at Cherry street. The fact is she testifies when she got to that crossing the caution sign was on; that she slackened her speed, that the green light came into view and that she went across; that she then went into second; then says, she cannot usually tell how soon she goes into high, has no particular time in which to make the change, that it just "depends on the humor I'm in as sometimes I shift right back." It is to be supposed that when she crossed the intersection line she slowed down to the speed limit of ten miles on Thomas street and thereafter a change of humor suddenly coming over her she went into high and was speeding at 25 or 30 miles an hour when her car ran into plaintiff. Such speed, particularly at night, on one of the principal streets of Hammond was dangerous, if not reckless. On a street, we may remark, where the city had found proper to limit the speed of autos to ten miles an hour.

Miss Camille Delcourt, plaintiff's daughter, who was sitting at the wheel of her car, says, she saw when Mrs. Bernard's car passed her car; that Mrs. Bernard turned her head and looked at the picture show building or at somebody in front, meaning of that building, as we understand her testimony. True, Miss Camille is plaintiff's daughter, but considering that Mrs. Bernard was doubtless careless of consequences judging from her excessively fast driving, we find nothing that makes it improbable that she listlessly turned her head towards the moving picture building, failed to see plaintiff and ran into him. If she did not turn her head, as testified to by Miss Delcourt, the collision was the result, however, of the excessive speed at which she was driving, and was due solely to her own negligence or fault. We find that plaintiff was not guilty of contributory negligence, as contended for by defendant, and is entitled to the recovery of damages.

## AMOUNT

The first judgment against defendant was for $1,700, the second for double, $3,400.

Plaintiff was knocked unconscious, had a fracture of the floor of the orbit or socket of the right eye which affected his left eye. He had good eyesight before the accident and wore no glasses but has been wearing them since. His vision was considerably affected, about 50 per cent loss, he claims.

He suffered with diabetes prior to the injury but had only a mild case as appears

from the evidence of eminent physicians and which could be easily controlled by proper care and dieting. He was then vigorous, full of pep and attended to a large and lucrative practice. Following his injuries he lost about 30 or 35 pounds in weight. It is shown that diabetes is almost invariably and deleteriously affected by body wounds or injuries, even by severe shocks to the system. Plaintiff suffered a good deal from these injuries and was not altogether well when the case was tried. The evidence, expert and otherwise, justifies the inference that his loss of weight should be ascribed to the injury he suffered from the collision, also his diminished eyesight, and the decline in his general health.

We are bound to conclude that his general health will remain affected for some time yet, if not permanently as the result of the accident, and we cannot see that he can reasonably expect a complete restoration of his vision. Good eyesight is precious to all and is particularly so to a physician actively engaged in the practice of his profession, as is the plaintiff.

He has suffered painful and severe injuries, but we think that the amount of $3,400 decreed in the last judgment, from which this appeal is prosecuted, is excessive and should be reduced to $2,500, which will be sufficient to meet the ends of justice.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be reduced from $3,400 to the sum of $2,500; that plaintiff have judgment against defendant for the latter stated amount; and as thus amended the judgment be affirmed. Appellee to pay the cost of appeal, those of the court below to be paid by defendant.